# *In The Matter Of:*

## Michael Branch v. Henry Ford Community College

## Lisa Copprue

## August 29, 2013



Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL BRANCH,
            Plaintiff,

        vs.        Case No. 4:12-cv-13141
            Hon. Mark A. Goldsmith
HENRY FORD COMMUNITY COLLEGE
and LISA T. JONES-HARRIS,
jointly and severally,
            Defendants.

_____

Deposition of LISA T. COPPRUE
Taken at 33900 Schoolcraft Road
Livonia, Michigan
Commencing at 10:32 a.m.
Thursday, August 29, 2013
Before Paula S. Raskin, CSR-4757

---

Page 2

1    SHAUN P. GODWIN
2    Godwin Legal Services, PLC
3    450 West Fort Street, Suite 200
4    Detroit, Michigan 48226
5    (313) 288-2826
6    shaun@godwinlegal.com
7        Appearing on behalf of the Plaintiff
8
9    EILEEN K. HUSBAND
10   Cummings McClorey Davis & Acho, PLC
11   33900 Schoolcraft Road
12   Livonia, Michigan 48150
13   (734) 261-2400
14   ehusband@cmda-law.com
15       Appearing on behalf of the Defendants
16
17   DANIEL B. TUKEL
18   Butzel Long, PC
19   41000 Woodward Avenue
20   Bloomfield Hills, Michigan 48304
21   (313) 225-7047
22   tukel@butzel.com
23       Appearing on behalf of the Defendants.
24
25   ALSO PRESENT:  Michael Branch, Plaintiff

---

Page 3

1    TABLE OF CONTENTS
2
3    WITNESS                     PAGE
4    LISA T. COPPRUE
5
6    EXAMINATION BY MR. GODWIN:        5
7
8        EXHIBITS
9
10   EXHIBIT                  PAGE
11   (Exhibits attached to transcript.)
12
13   DEPOSITION EXHIBIT NO. 1      30
14   DEPOSITION EXHIBIT NO. 2      49
15   DEPOSITION EXHIBIT NO. 3      50
16   DEPOSITION EXHIBIT NO. 4      87
17   DEPOSITION EXHIBIT NO. 5      88
18   DEPOSITION EXHIBIT NO. 6      89
19   DEPOSITION EXHIBIT NO. 7      95
20   DEPOSITION EXHIBIT NO. 8      96
21
22
23
24
25

---

Page 4

1    Livonia, Michigan
2    Thursday, August 29, 2013
3    10:32 a.m.
4
5            LISA T. COPPRUE,
6    was thereupon called as a witness herein, and after
7    having firs t been duly sworn to testify to the truth,
8    the whole truth and nothing but the truth, was
9    examined and testified as follows:
10           MR. GODWIN:  Good morning.  Can you state
11   your name for the record?
12           THE WITNESS:  Yes.  Lisa Copprue,
13   C-O-P-P-R-U-E.
14           MR. GODWIN:  Ms. Copprue, have you had your
15   deposition taken before?
16           THE WITNESS:  I don't recall that I --
17   actually I have had my deposition taken, yes.
18           MR. GODWIN:  Okay.  When you're answering
19   questions, if you need to say yes or no, say yes or
20   no.  Don't nod your head or say uh-huh.  We need to
21   get a clear transcription of everything that's said
22   today.
23       If you don't understand a question that I
24   ask, you can ask me to repeat it, you can ask me to
25   rephrase it.  I'm going to understand that you

Page 5

1  understand the question that I asked you, and so if
2  you don't understand anything just ask me to rephrase.
3  Okay?
4        THE WITNESS:  Yes.
5        MR. GODWIN:  If you need a break at any
6  time for any reason, just let us know, we'll take a
7  break.
8        THE WITNESS:  I will.
9              EXAMINATION
10 BY MR. GODWIN:
11 Q.  You said you had a prior deposition.
12 A.  Yes, I did.
13 Q.  What was that --
14 A.  Actually I -- it was in a former position, the one
15    right before Henry Ford Community College, and my
16    supervisor was being questioned about a decision that
17    he made and I was used as a witness.
18 Q.  Did someone bring an employment discrimination case or
19    some type of employment case against that supervisor?
20 A.  It was a situation where a student with a disability
21    felt that he made a decision about an accommodation
22    that she requested where he indicated that she -- that
23    it wasn't a reasonable accommodation.
24 Q.  And where were you working at that time?
25 A.  At Kaplan Institute in Detroit, Michigan.

Page 6

1  Q.  And what was your position there?
2  A.  I was the director of education.
3  Q.  What years did you hold that position?
4  A.  From 2005 to 2007.
5  Q.  And what were your duties as the director of
6     education?
7  A.  Uh-huh.  I oversaw the hiring -- I'm sorry, the
8     recruitment, hiring, training and evaluation of health
9     career faculty.  I also oversaw accreditation.  I
10    supervised the office of the registrar, student
11    success, career services, and also I oversaw student
12    retention.
13 Q.  Where were you working prior to being the director of
14    education at Henry Ford?
15 A.  I was for eight years prior to that, beginning in 1997
16    through that time, at Marygrove College.  Over the
17    time that I was there, my position title changed due
18    to various restructuring.  It started as dean of
19    students, then vice president for student affairs.
20    Then they combined the academic and student affairs
21    unit, and I was associate vice president for academic
22    and student affairs -- I'm sorry, associate provost,
23    and that was over academic and student affairs.
24 Q.  Where did you work prior to working at Marygrove?
25 A.  University of Detroit Mercy, and I started working

Page 7

1  there in 1995 through 1997 and I was director of
2  student life.
3  Q.  Prior to '95, where were you working?
4  A.  At Monroe County Community College, and I was an
5     associate professor slash counselor there from 1991
6     through 1995.
7  Q.  And where were you working prior to that?
8  A.  Right.  So prior to that, from 1990 to '91, I was a
9     fellow, a graduate fellow, at Marquette University and
10    I was completing my Ph.D. full-time.  I was working on
11    my dissertation full-time, so I got a stipend.
12 Q.  And did you get your graduate degree from Marquette?
13 A.  I did.  I got my Ph.D.
14 Q.  Ph.D.?
15 A.  Correct.
16 Q.  What's your Ph.D. in?
17 A.  Counseling, with a minor in higher education
18    administration.
19        Did you want to know the couple prior to
20    that?
21 Q.  Yes.
22 A.  Okay.  From 1988 to 1990, I was assistant dean of
23    students at Marquette University and started my Ph.D.
24    at the time.
25        And prior to that, I was a full-time

Page 8

1  student.  From 1986 to 1988, I received my master's
2  degree in higher education administration from
3  Michigan State University.  From 1986 to 1988 -- I'm
4  sorry, from -- yeah, 1986 to 1988.
5        From 1983 to 1986, I was completing my
6  bachelor of science in psychology.
7        MS. HUSBAND:  Can we go off the record for
8  just a second.
9        (Off the record at 10:39 a.m.)
10        (Back on the record at 10:40 a.m.)
11        MR. GODWIN:  Back on the record.
12 BY MR. GODWIN:
13 Q.  You were saying that you received your bachelor's of
14    science in psychology?
15 A.  Uh-huh.
16 Q.  That was 1983 to 1986.
17 A.  Yes.  And then prior to that, from 1981 of January
18    through March of 1983, I was a student at Henry Ford
19    Community College taking transfer courses to transfer
20    to Michigan State in 1983.
21        And prior to that, I was in high school.
22 Q.  Did you grow up in Dearborn?
23 A.  No, I didn't.  Actually I was born in Detroit, and for
24    some years my family moved to California, and then we
25    moved back to Detroit and that's where I've been up

## Page 9

1   until I started Henry Ford.

2   Q.  And have you read the Complaint that was filed in this

3   case by Mr. Branch?

4   A.  I read the complaint.  There was -- I think there were

5   a couple.  I think there was -- there was -- Marge

6   Swan, whenever there's any form of suit, she primarily

7   handles that and she reads the complaint and then

8   she's worked with our attorneys.

9        There was a complaint -- I don't know if it

10   was ACLU or a discrimination complaint or something

11   like that, and I read that, so I don't know if that's

12   different than this complaint.  I -- I mean I was --

13   Marge summarized the complaint to me.

14   Q.  Did you review anything in preparation for your

15   deposition today?

16   A.  The only thing that I reviewed was there was a -- the

17   letter that I sent to him, so I know what date it was.

18   And then also I reviewed the original complaint that

19   came from campus safety.

20   Q.  When did you first become aware of Mr. Branch?

21   A.  Those days I do remember, again because I went through

22   the campus safety report.

23        I received a report on or immediately after

24   March 4th.  That was the date that there was a report

25   filed, that was actually written and filed, and I

## Page 10

1   received a copy in my office and it was a complaint

2   from an individual, and based on the information, I

3   called our behavioral intervention team -- we call it

4   BIT -- to review it.

5        MS. HUSBAND:  You have to answer just the

6   question that Mr. Godwin's asking you.

7        Sorry about that.

8   BY MR. GODWIN:

9   Q.  You're saying the behavior intervention team, you

10   talked to them?

11   A.  Yes.

12   Q.  What did you talk to them about?

13   A.  Well, when we reviewed the campus safety complaint, we

14   saw that Mr. Branch had restrictions on his -- on a

15   record, on his criminal record, that would based on

16   the layout of our campus prevent him from being on

17   campus.

18   Q.  Who's on the behavior intervention team -- or at this

19   time who was on the behavior intervention team?

20   A.  At this time, there is the vice president for finance,

21   the vice president for administration, the director of

22   campus safety and myself.  Those are the positions

23   essentially.

24   Q.  Do you recall the names of the people that were on

25   that --

## Page 11

1   A.  At the time --

2   Q.  -- in those positions at that time?

3   A.  At that time, yes.  Dr. Cynthia Eschenburg, at that

4   time she oversaw human resources; myself; Marge Swan,

5   who's vice president for finance and administration at

6   the time, and her actual title was vice president

7   controller; and our director of campus safety, Mark

8   Weimerskirch, he was interim at the time.

9   Q.  What's the purpose of the behavior intervention team?

10   A.  The purpose is to be a first response team to look at

11   all facts if they're presented about anything that

12   could be a potential threat to the safety and welfare

13   of the campus and to determine what actions should or

14   should not take place.

15   Q.  And what was decided -- and what -- after you reviewed

16   the complaint with the behavior intervention team, did

17   the behavior intervention team reach any decisions or

18   conclusions?

19   A.  What we discussed was looking at the -- we looked at

20   the restrictions, and we determined in that situation

21   what is our consistent process in terms of how we

22   would address that, and the decision was to address it

23   as we have in every situation where there are

24   restrictions that a student has that prevents him from

25   being on campus, and that is, that the student is not

## Page 12

1   able to be on campus.

2   Q.  What situations would a student have that wouldn't

3   allow them on campus?

4   A.  If the restriction prevents them from being within a

5   certain number of feet of a school, a park, a child

6   care center, and in the layout of our campus, that is

7   the case.  If they're not to be within certain

8   proximity or in connection with underage individuals.

9   Q.  And those are related to parole restrictions?

10   A.  That's related to any restriction, yes, and if it's a

11   restriction.

12   Q.  So what other types of documents or -- would you look

13   at beyond parole restrictions to determine whether a

14   student's allowed on campus or...

15   A.  That's it.

16   Q.  Just parole restrictions?

17   A.  The parole restrictions, yes.

18   Q.  Have you ever looked at personal protection orders in

19   the past?

20   A.  No.

21   Q.  Probation restrictions?

22   A.  Any restriction, -- any legal restriction would be the

23   same whether it's probation or parole.  In these

24   situations, it happened to be parole restrictions.

25   Q.  What other restrictions beyond parole have you looked

Page 13

1    at in the past in regards to students and their
2        ability to attend the campus?
3    A.   What other restrictions?  We've not looked at other --
4        any other restrictions.  These are legal restrictions.
5    Q.   I understand they're legal restrictions and the
6        restrictions that you've mentioned reviewing of
7        Mr. Branch's, which were parole restrictions, and I'm
8        asking if there's any other legal restrictions other
9        than parole restrictions that you've ever looked at in
10       regards to students and whether they can attend the
11       school.
12   A.   No, we have not.  If you're asking me what we have
13       looked at, we have only looked at parole restrictions.
14       We've not been presented with any other legal
15       restrictions that have been presented to us.
16   Q.   And you said the decision that you reached in regard
17       to Mr. Branch, that you had used that same process in
18       the past?
19   A.   Yes.
20   Q.   How many times had you utilized that process in
21       regards to parole restrictions prior to Mr. Branch?
22   A.   Every case where a student was presented to us, we've
23       used the exact same method.  We've used those parole
24       restrictions.
25   Q.   Prior to Mr. Branch's case coming to your attention,

Page 14

1    had you ever expelled or disciplined a student who had
2        a restriction on their parole not allowing them to
3        have contact with minor children?
4        MS. HUSBAND:  I just want to place an
5        objection on the record, the compound nature of the
6        question combining expulsions and disciplines
7        together.  Could you rephrase the question maybe so
8        that she can answer the question --
9    BY MR. GODWIN:
10   Q.   Is there a difference between expulsion and
11       discipline?
12   A.   Yes, there is.  There may be a time where a student is
13       not allowed to enter the campus for reasons of safety,
14       and there are also times that a student is suspended,
15       dismissed, expelled, however you might want to phrase
16       it, but either suspended or expelled based on
17       disciplinary reasons, conduct/behavior reasons.
18   Q.   In regards to Mr. Branch, did you discuss any other
19       issues related to Mr. Branch with the behavioral
20       intervention team beyond the restrictions in the
21       parole?
22   A.   No.
23   Q.   So the decision was made to expel just based on those
24       restrictions.
25   A.   The decision was made that he could not be on campus

Page 15

1    because his parole restrictions prevented it.
2    Q.   And in prior cases where you've had the same situation
3        arise with parole restrictions, would you ever discuss
4        anything beyond the parole restrictions when making
5        the decision to discontinue attendance or expel,
6        depending on your --
7    A.   Never.
8    Q.   And why -- what are the parole restrictions that will
9        cause a person to no longer be allowed to attend Henry
10       Ford Community College?
11   A.   If in fact the individual is not allowed to be within
12       a certain number of feet of a child care center,
13       within a certain proximity of underaged individuals,
14       in close proximity to a school or to have access at
15       any time to computers that are internet connected.
16   Q.   When was this policy first developed -- or this
17       process for determining who is able to attend the
18       school due to parole restrictions, when was that
19       developed?
20   A.   It had to have been developed before I got there.  I'm
21       not certain exactly when, but it's always been in
22       place since I've been in this role.
23   Q.   And has that process been reduced to writing?  Is
24       there a written set of guidelines?
25   A.   Is there a written set of guidelines?  Not to my

Page 16

1    knowledge.
2    Q.   The behavior intervention team, was that in place when
3        you started working for Henry Ford?
4    A.   It was not, no.
5    Q.   It was not.
6    A.   No.
7    Q.   When was the behavioral intervention team started?
8    A.   I would say 2010-11, and -- yeah, 2010-11.
9    Q.   And how was that established?
10   A.   It was established because -- you know, as most
11       institutions, we always want to improve in our
12       processes and safety and also in communication.  And
13       Marge Swan and myself went to a conference on
14       establishing that, as many schools across the country
15       now have them, and we received training from the
16       interim director of campus safety at that time, Mark
17       Weimerskirch, who does national training for Homeland
18       Security.
19   Q.   What was the conference that you went to that you
20       received the training?
21   A.   The acronym is NABITA, N-A-B-I-T-A.
22   Q.   Where was it?
23   A.   In New Orleans.
24   Q.   Do you know when it was?
25   A.   Oh, my God.  I don't remember specifically when it

Page 17

1    was.  It was during that academic year.
2    Q.  And did you specifically discuss parole restrictions
3        at that conference?
4    A.  No, not specifically.
5    Q.  And what training did you receive from the interim
6        director of public safety?
7    A.  General threats, everything from fires on campus,
8        storms, evacuation procedures, building safety.  It
9        was a variety of things, and it was training for us
10       and then the rest of the campus on all those matters;
11       safety during evacuations for those who are
12       handicapped in a building, just a variety of things.
13             Additionally, in terms of relevance here,
14       there was training on, you know, identifying potential
15       threats and what they might be, looking at student
16       issues and understanding balance between civil and
17       other legal rights versus, you know, appropriate
18       precautions and responses to potential threatening or
19       issues or safety concerns.
20   Q.  How were decisions made prior to the establishment of
21       the behavior intervention team with regard to students
22       with parole restrictions?
23   A.  Because at the time Marge Swan was the supervisor --
24       the vice president and oversaw campus safety, she and
25       I would meet.  There would be times that we would

Page 18

1    bring in the campus safety director, and there would
2    be times that we would contact legal counsel, but she
3    and I worked together as a team on those.
4    Q.  Are your decisions to -- were your decisions in
5        Mr. Branch's case or in any of the cases prior where a
6        student was not allowed to continue their attendance
7        due to parole restrictions, were those decisions ever
8        reviewed by any other parties prior to implementing
9        those decisions?
10   A.  I can only speak from the time in which I started work
11       there, so of course Marge Swan had been there longer,
12       and the first time this situation was presented to me
13       during the 2007-08 year, I said how are we handling
14       this, and she indicated we have to look at the
15       restrictions and we have to determine whether or not
16       these restrictions contradict the layout of the campus
17       and if any of the restrictions prevent the student
18       from being on campus.
19             And so that became the norm, and we -- you
20       know, for me.  She had been doing it prior.  So in
21       terms of looking at these specific restrictions, there
22       are a number of them that have no relevance to the
23       college at all or the layout, only those that are
24       relevant to the campus.
25   Q.  Have you ever -- prior to Mr. Branch's case, in any of

Page 19

1    these situations where an individual came to your
2    attention with parole restrictions, did you ever find
3    that their parole restrictions allowed them to attend
4    the campus?
5    A.  Never.
6    Q.  Did you ever encounter an individual that had a
7        restriction -- strike that and ask you a different
8        question.
9             Does everybody that comes to you with these
10       type of parole restrictions have a restriction against
11       being around underage or -- underage children or X
12       number of feet from a child care center they can't go,
13       or they can't go in a student safety zone?  Do all of
14       the -- have all the individuals that have come in
15       front of you with this situation of parole
16       restrictions had those same restrictions, or do some
17       have restrictions and not others, certain restrictions
18       and not others?
19   A.  I guess I want to -- I want to put it in context.  I
20       mean I see a lot of cases or a lot of situations.
21             The only individuals that we say cannot be
22       on campus are those whose parole restrictions are
23       directly in conflict with the particulars in the
24       layout of the campus.
25   Q.  How many individuals have come in front of you during

Page 20

1    the course of your employment with Henry Ford
2    Community College that have parole restrictions and
3    you've had to make a decision as to whether they could
4    continue to attend or not?
5    A.  Uh-huh.  Are you saying how many people --
6    Q.  How many students.
7    A.  Okay.  I just want to clarify, are you saying how many
8        individuals have come before me that have the same
9        restrictions as Mr. Branch?
10   Q.  How many individuals have come before you with parole
11       restrictions related to underage children, being
12       within a certain number of feet from a child care
13       center, certain number of feet from a school safety
14       zone or being connected to -- or not being allowed to
15       be connected to the internet?
16   A.  Okay.  I don't know the exact number.  What I can tell
17       you is that it is definitely over a dozen, and that's
18       from 2007 to present.
19   Q.  Would you have been the person that handled these
20       types of situations if they had arisen prior to 2007
21       during your employment?
22   A.  Yes.
23   Q.  It just never came about before 2007.
24   A.  I just don't -- I have not gone back to review the
25       prior cases, so I've not reviewed because there's been

Page 21

1   no reason to go back and look at prior files.  So I
2   just can't speak for before I got there.
3   Q.  You only got there in 2007.
4   A.  Correct.
5   Q.  I see.  I forgot that fact, thank you.
6   A.  No problem.
7   Q.  Do you know what a school safety zone is?
8   A.  Technically?
9   Q.  Yes.
10  A.  I do not, in terms of the whole scope of it.  What we
11      look at -- and I've not used that term.
12          For us, what we specifically look at and
13      had made a decision on in terms of cases such as this
14      is being within a certain number of feet of a child
15      care center, a school, or within a certain number of
16      feet of underaged individuals, children, and if in
17      fact a person is not supposed to have access to
18      internet, a computer with internet access.  Those are
19      the items that we focus on.
20          I have-- -- to be honest, I haven't ever
21      factored in a comment about a school safety zone.
22  Q.  Okay.  So you were given a copy of the preliminary
23      complaint report that was prepared by the campus
24      safety department.
25  A.  Yes.

Page 22

1   Q.  What documents or types of memorandum were included in
2       that preliminary complaint report or attached to it?
3   A.  Correct, okay.  So it was the standard campus safety
4       report that indicated the complaint and the times and
5       dates, and along with that was a copy of -- I'm trying
6       to think what was with that.  I don't remember what
7       was attached to it.
8   Q.  Was there one document attached?  Were there more than
9       one document attached?
10  A.  If I respond to that, that -- yeah, I don't remember
11      what was attached to it.
12  Q.  Was a document from the Michigan Department of
13      Corrections attached to that complaint?
14  A.  This is why I can't indicate why I don't remember
15      because I know that I did.  I had a copy of OTIS
16      because when I received the complaint and I read it,
17      there were some statements in there that indicated --
18      they were from the complainant, the person who
19      complained -- indicated that she looked and saw that
20      he was on the sex offender list and brought that to
21      the campus safety's attention.  And because of that
22      comment in the complaint, I also went and pulled up
23      OTIS, and then I went to the sexual offender registry,
24      and I had it.
25  Q.  And did you -- did you print out a copy of the OTIS --

Page 23

1   A.  Uh-huh.
2   Q.  -- and the sex offender listing?
3   A.  Yes, I did.
4   Q.  And you brought the preliminary complaint report and
5       the OTIS printout and the sex offender list printout
6       to the attention of the rest of the behavior
7       intervention team.  Is that correct?
8   A.  That is correct, though by the time we had the
9       meeting, campus safety had also pulled up the
10      documents.
11  Q.  Do you recall when the complaint was made, the PRA --
12      the P-- -- preliminary complaint was made?
13  A.  It was I believe March 3rd was when the complaint was
14      originally made, and then the document -- or the
15      complaint was written on March 4th.
16  Q.  And this is 2010?
17  A.  I believe it was 2011.
18  Q.  Oh, okay.  So March 3rd of 2011, March 4th of 2011.
19  A.  Yes.
20  Q.  And when did you have a meeting?
21  A.  March 5th.  I'm almost 99.9 percent sure it was March
22      5th.
23  Q.  Where was that meeting conducted?
24  A.  It was held in my office.
25  Q.  Do you keep minutes or records of decisions that you

Page 24

1   make in these meetings?
2   A.  Actually, no.  If there is something a lot more
3       complex.  Probably in this situation, we did not have
4       minutes.
5   Q.  What types of situations would you require the making
6       of a record or minutes related to the meeting?
7   A.  Something with many, many steps, where many people
8       have to be deployed here and there to keep track.
9   Q.  Are you talking about a security situation, or what
10      are you referring to?
11  A.  Any situation.
12  Q.  Can you think of an example?
13  A.  Where we had to keep documentation, one in which there
14      was a safety situation similar to this, but then there
15      were also a number of complaints from a number of
16      people about other sorts of behaviors that we would
17      need to write a list of everyone that we had to speak
18      to, both internal and external, so that we had the
19      situation -- had the information at hand.  And in that
20      circumstance, it wasn't just the parole restrictions.
21      There were also threats by the individual and we had
22      to be very concerned about individuals who this person
23      threatened.
24  Q.  And this was prior to Mr. Branch's case?
25  A.  It was.

Page 25

1    Q.  But it was in 2011?
2    A.  I don't remember if it was -- I don't remember the
3        exact date.  All I know is that it was before this
4        case.
5    Q.  In that case, did that student have a hearing?
6    A.  In that case, no, the student did not.  The student
7        couldn't be on campus because of the restrictions.
8    Q.  Have you ever had a student with behavior -- where you
9        had behavior concerns about an incident and they
10       have parole restrictions and that student elected to
11       have a hearing?
12   A.  No.  Are you saying these same ones that we're
13       talking about; the schools, the underage and all that?
14   Q.  Yes.
15   A.  Okay.  No.
16   Q.  When a student has a behavioral issue brought to your
17       attention by campus safety, do they check everybody to
18       see if they have a criminal history?
19   A.  If --
20           MS. HUSBAND:  Object as to lack of
21       foundation.  She doesn't work in campus safety.
22           Do you know?
23   A.  I don't know.
24   BY MR. GODWIN:
25   Q.  When you receive a complaint, preliminary complaint

Page 26

1        report from campus safety regarding a student with a
2        behavioral issue, have you ever seen a criminal
3        history attached to that?
4    A.  Yes.
5    Q.  To your knowledge, do they check that in every case?
6    A.  I don't know.  You'd have to ask them the procedure.
7    Q.  Would you expect them to check in every case?
8    A.  If a student -- I would expect that if a student has a
9        complaint made against them where it is a potential
10       threat to the campus -- and I can define these items
11       clearly; where there's a weapon involved, where there
12       has been an assault, in stalking instances, an
13       instance of chronic harassment, an instance of threats
14       made against an individual -- in those circumstances,
15       I would expect that they would pull a record.
16   Q.  What type of criminal records or -- have you seen
17       attached to preliminary complaint reports?
18   A.  Those same things.
19   Q.  You've seen OTIS printouts attached to preliminary
20       complaint reports in the past?
21   A.  Yes.
22   Q.  Have you ever seen printouts from the law enforcement
23       information network?
24   A.  I don't know what that is.
25   Q.  Have you seen other documents beyond the OTIS

Page 27

1        documents attached to preliminary complaint reports?
2    A.  Never.
3    Q.  How do you organize a meeting of the behavioral
4        intervention team?
5    A.  One of two ways.  You know, again, it's an emergency
6        meeting called.  Either I send an e-mail indicating we
7        have a case to review or my assistant calls everyone
8        and indicates that we need to review a situation and
9        we establish the meeting time.
10   Q.  How was the meeting for Mr. Branch's situation
11       organized?
12   A.  It was organized the same way.  I don't remember if I
13       sent -- we made a phone call to everyone.  I know that
14       I contacted people by phone myself, and I don't recall
15       if I sent an e-mail -- needed to send an e-mail with
16       that.  My assistant was on vacation around that time
17       period, so...
18   Q.  How long does the meeting take?
19   A.  It depends on the circumstance we have.
20   Q.  This meeting with Mr. Branch, excuse me.
21           MS. HUSBAND:  Well, just for clarification,
22       do you mean the meeting about Mr. Branch?  I think
23       you -- the record she's got here is that you asked a
24       question the meeting with Mr. Branch.  I just want
25       to...

Page 28

1    BY MR. GODWIN:
2    Q.  Was the meeting with the behavioral intervention team
3        regarding Mr. Branch's parole restrictions, do you
4        recall the length of time that meeting took?
5    A.  I don't, but I do -- I don't know the exact length of
6        time, but I do know that it lasted anywhere from a
7        half hour, 45 minutes.
8    Q.  And what plan of action was determined at the meeting?
9    A.  Uh-huh.  Well, what we -- we discussed the
10       restrictions, and Ms. Swan's response was on
11       consistency, what had we done in prior cases with
12       these restrictions, and I responded, you know, based
13       on what we've done; that we send a letter to the
14       individual stating that based on the restrictions and
15       the layout of the campus, that they're not -- we're
16       not able to support their enrollment, that they're not
17       able to be there.
18           What we like to do, because the mail will
19       take a couple days, is to have someone contact the
20       individual directly, and in that circumstance, I asked
21       campus safety to make contact by phone or by contact
22       going to class.
23   Q.  Do you ever contact those individuals by phone?  Have
24       you ever?
25   A.  Have I ever?

Page 29

1    Q.  Yes.
2    A.  Not prior to this case.  I have.  When a campus safety
3        officer that we want to handle it, someone who is an
4        administrator, someone who is, you know, fully -- has
5        had a lot of experience, is compassionate, and so I
6        have contacted individuals if there's not a manager or
7        supervisor around to contact them in -- within 24
8        hours, so if someone's on vacation or whatever.
9    Q.  From public safety?
10   A.  From public safety, one of the supervisors.
11   Q.  So you determined that you were going to send a letter
12       based on those restrictions and being unable to
13       accommodate Mr. Branch's education.
14           What else did you determine to do at that
15       meeting?
16   A.  That was it.
17           One of the other items that I do want to
18       state in terms of practice for campus safety, when
19       they contact the individual, they indicate to them
20       that if they have any questions about the letter --
21       they're going to get a letter, they're not able to be
22       on campus, and if they have any questions, to contact
23       me, to call my office.
24   Q.  And then you did write a letter to Mr. Branch.  Is
25       that correct?

Page 30

1    A.  That's correct.
2           (DEPOSITION EXHIBIT NO. 1 MARKED
3           FOR IDENTIFICATION at 11:27 a.m.)
4    BY MR. GODWIN:
5    Q.  Can you take a look at this document that's been
6        marked as Exhibit 1 and tell me if you recognize it
7        and what it is.
8    A.  Uh-huh.  Yeah, this is the letter that I drafted and
9        had sent to Mr. Branch notifying him of his parole
10       restrictions and the fact that we could not allow him
11       to be on campus.
12   Q.  You reference a -- being within 1,000 feet of a
13       student safety zone, kindergarten through twelfth
14       grade.
15   A.  Uh-huh.  That was taken directly from the
16       restrictions, so I listed -- I listed that.
17   Q.  And we discussed this before, but you have not --
18       you're not aware of what the definition of a student
19       safety zone is, are you?
20   A.  No, I'm not.
21   Q.  You reference 500 feet of a child care facility --
22   A.  Uh-huh.
23   Q.  -- or a preschool.
24   A.  Uh-huh.
25   Q.  Why did you reference that?

Page 31

1    A.  Because in the center of our campus, our main campus,
2        we have a child care facility.
3    Q.  And where was Mr. Branch?  Where was Mr. Branch's
4        classes?
5    A.  That semester, I don't know where his classes were.
6    Q.  Did you know at the time you wrote the letter?
7    A.  Uh-huh, I did not know.
8    Q.  Did you have any information that Mr. Branch had gone
9        within 500 feet of a child care facility?
10   A.  No, but that would not prevent him from doing so
11       because classes are held in every building on campus.
12   Q.  The restriction would prevent him from being on campus
13       because anywhere -- any place he would attend class at
14       the Evergreen campus would be within 500 feet of the
15       child care center?
16   A.  It could be.
17   Q.  So there are buildings that are more than 500 feet
18       from the child care center?
19   A.  There are.
20   Q.  What buildings are within 500 feet of the child care
21       center?
22   A.  I would have to go and do a measurement and let you
23       know.
24   Q.  Do you know of any buildings that are within 500 feet
25       of the child care center?

Page 32

1           MS. HUSBAND:  I think she answered the
2        question.
3    A.  Yeah, I did.  I'd have to do a measurement and let you
4        know.
5    BY MR. GODWIN:
6    Q.  So you're not sure if any building is within 500 feet
7        of the child care center or not.
8    A.  I'm not sure of the exact distance, but I do know that
9        the parking lots that the students use, where they
10       must park to get to any of the buildings, that there
11       are at least two parking lots adjacent to the child
12       care facility.
13   Q.  Are students required to park in the two parking lots
14       adjacent to the child care center?
15   A.  All students are not required to park in any
16       particular parking lot, but they are also not
17       restricted from parking there either.
18   Q.  Are there parking lots outside of 500 feet from the
19       child care center where students can park?
20   A.  There are.
21   Q.  Is it possible to get to the campus without going
22       within 500 feet of the child care center?
23   A.  It's possible.
24   Q.  Do you know what campuses or campus that Mr. Branch
25       was attending on the day you wrote this letter?

Page 33

1   A. Uh-huh, the main campus, and campus safety informed
2   the BIT that he was taking classes in the main campus.
3   I just don't know what he was taking at the time.
4   Q. Did you have any information that he was having any
5   classes at the Dearborn Heights campus?
6   A. No. And Dearborn Heights is the school. I don't know
7   if he ever took classes at the Dearborn Heights
8   campus, but in terms of clarification, the child care
9   center is on campus, but also we have on average a
10  thousand students who are dual enrollment, which is
11  unique.
12          We have the largest dual enrollment school
13  in the state of Michigan where we have a thousand dual
14  enrollment students, and they can be in any class at
15  any time and we cannot control where those students
16  are in classes or who's in class with them.
17  Q. Dual enrollment meaning high school students from
18  Dearborn --
19  A. They could be Dearborn, they could be Detroit. We
20  have a large dual enrollment population from Dearborn.
21  We have Detroit, and we have some downriver schools,
22  schools in Inkster.
23  Q. And this allows students to get college credits while
24  they're going to high school and kind of get
25  accommodated to the entire college process and get a

Page 34

1   jump start on their college careers. Is that right?
2   A. Correct.
3   Q. You reference in this letter the student conduct
4   policy.
5   A. Yes.
6   Q. And that's -- is that referring to the policy -- also
7   known as policy 8100, the student conduct policy and
8   due process procedure?
9   A. Uh-huh.
10  Q. Why did you reference the student conduct policy in
11  this letter?
12  A. Uh-huh, for a few reasons. You know, we always -- I
13  always, even in these cases, reference it.
14          Number one, if a student is in violation by
15  law of any restrictions, it's a violation of the code
16  of conduct policy, so they can't then violate a legal
17  restriction and then being in compliance. That's
18  number one.
19          Number two, if there's question about, you
20  know, why didn't we follow A, B, C or D process, this
21  outlines, you know, our discretion to look at a case
22  and to make a decision on safety without following any
23  particular process.
24          The third reason is the individual's able
25  to read that conduct policy, which we always send. If

Page 35

1   we ever reference it, we send a copy of the conduct
2   policy with the letter and the individual's able to
3   see all their rights, but all their responsibilities,
4   and anything that may be relevant to their situation,
5   that is indicated in the policy.
6           And, number three, so they're able to
7   review the fact that there's an appeal process in
8   there as well. So it's helpful for them to have it so
9   they understand.
10  Q. Did you send a copy of the student conduct policy and
11  due process procedure to Mr. Branch with this letter?
12  A. My assistant did it, and every time she sends out a
13  letter she sends out the code of conduct policy every
14  time.
15  Q. There's no enclosure noted on this letter. Do you
16  know why?
17  A. We never indicate enclosure. We just haven't. It's
18  always included.
19  Q. And how is it helpful for a student to receive a copy
20  of the student conduct and due process procedures when
21  they -- when the school can't continue their
22  enrollment based on their parole restrictions?
23  A. It gives them understanding and allows them to read
24  and understand what the college policies and processes
25  are. It gives them more information.

Page 36

1   Q. How did you determine that Mr. Branch had broken a law
2   or legal restriction?
3   A. How do we determine that? Because his parole
4   restriction indicated he can't be within a certain
5   number of feet, and by him being on campus, he was in
6   violation of that.
7   Q. Did you speak to his parole agent prior to making that
8   decision and sending this letter?
9   A. I did not. I spoke to him after.
10  Q. Is Henry Ford Community College part of the department
11  of corrections?
12  A. Are they a part of the department of corrections?
13  Q. Is Henry Ford Community College, to your knowledge, a
14  branch or have any type of agreement with the
15  department of corrections to supervise the release of
16  prisoners who have been given parole status?
17  A. No, not that I'm aware. I've never heard of that.
18  Q. So you're not an agent of the Michigan Department of
19  Corrections?
20  A. No, absolutely not.
21  Q. Are you aware of anybody on the behavioral
22  intervention team that's an agent of the Michigan
23  Department of Corrections?
24  A. Currently? Former? Former?
25  Q. Who's a former?

Page 37

1   A.  The former is our director of campus safety, he's a
2       former sergeant of the Livonia Police.
3   Q.  Okay.  But he never worked for the department of
4       corrections?
5           MS. HUSBAND:  Just lack of -- form and
6       foundation.  I don't know if she knows those --
7   A.  I don't know these --
8   BY MR. GODWIN:
9   Q.  Let me clarify.
10  A.  Okay.
11  Q.  I had asked whether any member of the behavioral
12      intervention team --
13  A.  Are members.
14  Q.  -- in the past had ever been an agent of the Michigan
15      Department -- agent of the Michigan Department of
16      Corrections.
17  A.  No, sir.  I misunderstood.
18  Q.  If it comes to your attention that a student's been
19      found guilty of a criminal guilty while they're enrolled
20      at the school, can that become a basis for discipline?
21  A.  Yes, or dismissal, and we have to have proof that they
22      broke the law while enrolled as a student, and that
23      has happened on at least several occasions in the past
24      12 months.  Felony.
25  Q.  Only for felonies though?

Page 38

1   A.  In terms of -- I probably should retract that because
2       there have been some that they were arrested for
3       felony, and it was reduced to misdemeanors and we
4       follow through with the expulsion.
5   Q.  So if a person's charged with a felony and then they
6       are found guilty or plead guilty to a felony or a
7       misdemeanor as a result of that incident, that might
8       be a basis for discipline?
9   A.  Expulsion?
10  Q.  Expulsion.
11  A.  Yeah.
12  Q.  How about if a person is charged with a misdemeanor
13      and then pleads guilty to a misdemeanor?  Is that a
14      basis for discipline or expulsion?
15  A.  We have to review those on a case-by-case basis.
16      Every situation is not the same.
17  Q.  When you become aware of a criminal charge against a
18      student that's enrolled, what happens?  What do you
19      do?
20  A.  Can you rephrase that?  I'm sorry.
21  Q.  When you become -- become aware of a student that's
22      been charged with a criminal act whose enrolled in
23      school, what's the process that you follow to handle
24      that situation --
25  A.  Right.

Page 39

1   Q.  -- start it off.
2   A.  There are two routes.  If it is a -- if it is or could
3       be a safety issue for the health and welfare of those
4       on the campus, then we may handle it one way, as I
5       indicated, related to the felony charges, that it
6       poses a risk to the safety of the campus.
7           If in fact there is no safety risk, then we
8       go through the disciplinary process and determine
9       action, and that involves charging, notification to
10      the person charged, a hearing, and along the process
11      we follow our conduct policy and procedures.
12  Q.  If it's determined to be a safety risk, what is the
13      process that you follow in those situations?
14  A.  At that point, we call BIT together, and that's the
15      purpose; again, reviewing safety -- potential safety
16      risks, and we determine based on does this particular
17      case, are there cut and dry items that we've addressed
18      previously that in order to remain consistent, we do
19      the exact same thing.
20          In this particular circumstance, we looked
21      at the parole restrictions, we looked at what we've
22      done in the past related to those parole restrictions,
23      and we did the same thing.
24  Q.  If you're aware that somebody's been charged with a
25      felony and BIT determines it to be -- there to be a

Page 40

1   safety risk --
2   A.  Correct.
3   Q.  -- what happens at that point?
4   A.  We notify the individual that we were made aware that
5       they were charged and either, A, convicted, or they
6       were charged and there was substantial evidence
7       indicating that the person was -- that there was
8       enough evidence to charge, and we indicated that --
9       you know, that they are not able to return to the
10      campus.  It's a violation of student code of conduct
11      in terms of being in violation of the law and it poses
12      a safety risk to the college.  And in the specific
13      instances, there were -- there were robberies and
14      weapons involved, car jackings.
15  Q.  Does -- you said conviction or substantial evidence
16      existed to charge them.
17  A.  Correct.
18  Q.  Is the charge itself substantial evidence?
19  A.  No, absolutely not.
20  Q.  Have you ever considered a case where a person has not
21      been convicted or pled or the charges were dismissed
22      for some reason but there was substantial evidence?
23      Have you ever dealt with another type of case where
24      the person's just been charged?
25          MS. HUSBAND:  I'm just going to object to

## Page 41

1    the use of the term "evidence" as being a legal term
2    with specific meaning, and we're using it very loosely
3    here in the formal sense. So maybe if you could
4    rephrase the question. She's not an attorney --
5   BY MR. GODWIN:
6   Q. What do you mean by substantial evidence?
7   A. That it -- that information is determined based on
8    those that are a lot more aware than I between the --
9    for example, in the cases that we've dealt with with
10   our campus safety officer, who is a retired officer,
11   police sergeant and the supervisor at that department.
12   Some have been in Dearborn, some have been in Detroit,
13   one in Ferndale, and they determine -- those that are
14   doing the charging make those determinations and then
15   share that with us before we make it -- a decision.
16         If there's any question that the person may
17   be innocent, we withhold and we don't act.
18   Q. So you may act before the criminal case has been
19   resolved.
20   A. We may act before the criminal case is resolved, and
21   again, that recommendation comes directly from campus
22   safety, from the charging officers and their
23   lieutenant or sergeant or whomever we're working with
24   at the time.
25   Q. Are the -- the Henry Ford Community College campus

## Page 42

1    safety office, they're not law enforcement officers.
2    Is that correct?
3   A. No, they're not.
4   Q. They don't have any arrest powers that you know of.
5   A. No.
6   Q. If you decide to take action in a situation where
7   you've determined or believe it to be a substantial
8   safety risk due to a pending criminal charge or a
9   conviction that occurred, you -- that results in
10   termination? Or what is the -- what do you inform the
11   student of at that time?
12   A. We send a letter to the student indicating that they
13   were involved in -- and this is if witnesses, police
14   car chases, arrests, found guns on them, found drugs
15   on them, that they've been involved in a situation and
16   there's reasonable evidence to -- for being charged,
17   this is in violation of the student code of conduct.
18   If or when they determine that -- you know,
19   essentially it states something to the effect of if
20   there is a situation where these allegations aren't
21   true, contact the office.
22         Never had anyone respond, then, but I can't
23   recall the specifics in the letter.
24   Q. Are they advised -- they're advised to contact the
25   office if it's not true?

## Page 43

1   A. Well, they're advised if they have questions, if
2    there's any reason to believe that this information is
3    false, if they need some assistance or whatever in
4    general, to call the office, but I have to pull a
5    document to look to see the specific wording.
6   Q. You never had anybody call the office to dispute any
7   of these letters?
8   A. Oh, absolutely.
9   Q. You have?
10   A. We have. Not every time, but we have had them, yes.
11   Obviously if they're --
12   Q. And what -- what information are they given on the
13   phone call regarding disputing the letter and the
14   conclusion reached by you? Because the letter comes
15   from you, correct?
16   A. Correct. I tell them refer to the student code of
17   conduct that we sent them; that their behavior poses a
18   safety risk; if in fact they were directly involved in
19   this activity, that they're not able to be on campus.
20         Often when they're disputing, they're
21   disputing just not being able to come to school. I've
22   never had anyone say I didn't do it. I've never had
23   anyone say this is in violation of my rights, none of
24   that.
25   Q. And if they were to say that, what would you tell

## Page 44

1    them?
2   A. That's hypothetical. You know, I can speak about a
3    conversation I had with Mr. Branch.
4   Q. What would you do today if somebody called you and
5    said I dispute what this is, it's not true, I
6    shouldn't be expelled?
7        MS. HUSBAND: Objection, calls for
8   speculation.
9        Because we don't have a judge to rule, you
10   can answer.
11        THE WITNESS: Oh, okay, sure. Okay.
12        MS. HUSBAND: Do you want to repeat the
13   question, Shaun?
14   BY MR. GODWIN:
15   Q. If an individual called you today and said I dispute
16   this letter, I -- I dispute being expelled --
17   A. Okay.
18   Q. -- or not being allowed to return to campus, what
19   would you tell them?
20   A. Okay. Can I tell you what I have told -- because I
21   have to use a specific example either in Mr. Branch's
22   case or I can use another case where a person said I'm
23   disputing this.
24        Do you want me to give you a specific
25   example?

Page 45

1  Q.  Yes.
2  A.  For Mr. Branch or not Mr. Branch?
3  Q.  Not Mr. Branch.
4  A.  Not Mr. Branch, okay.  So an individual indicated --
5      and her case hadn't gone to trial yet and -- but she
6      essentially admitted to a felony act, and she said
7      that there were other circumstances, other items not
8      being reviewed by the police and that we weren't aware
9      of and all that.
10            And I said, you know what, let me hold off,
11     I'm not going to -- you know, there's a hold on your
12     record, but I'm not going to drop you out of your
13     classes.  So you can't re-register for future
14     semesters, but I'm going to give you by this timeline
15     to bring that documentation, drop it off at campus
16     safety directly, and we will review it.  And if
17     there's something else that we should consider, then
18     we'll do that, but in the mean time, this expulsion
19     needs to stand.
20  Q.  Was that individual informed of their right to have a
21     hearing?
22  A.  The individual had a letter indicating that we've been
23     informed by the police --
24  Q.  That's not what I asked.
25            MS. HUSBAND:  Well, your question assumes

Page 46

1      that they had a right to a --
2  A.  Uh-huh.  No, no.
3            MS. HUSBAND:  Objection as to form.
4  BY MR. GODWIN:
5  Q.  No, you didn't inform that individual that they had a
6      right to a hearing.
7  A.  No.
8  Q.  Is that because they don't have a right to a hearing?
9  A.  I understand your question; however, I guess I'm
10     concerned about how it's phrased, they don't have a
11     right to a hearing.
12            Essentially what we did -- and in this
13     situation and in previous situations where there is a
14     potential threat, then we deal with potential safety
15     threats different than other forms of discipline
16     without a threat involved.
17  Q.  Yes.  If there's a safety threat, then sometimes it's
18     necessary to have that person removed from campus
19     immediately before -- so that no activity can take
20     place to threaten the safety of the campus.
21  A.  Correct.
22  Q.  Does that individual have a right to have a hearing
23     regarding that decision?
24  A.  The reason we have hearings is to determine whether
25     the charge is valid based on the facts -- the

Page 47

1      information presented.  We're trying to determine
2      facts, whether or not an individual had committed a
3      crime, did what they were charged to do.
4            In this situation, it was indisputable that
5      these restrictions were in fact in place.
6  Q.  If a person who you believe had committed a felony and
7      posed a safety danger to the campus and they were not
8      allowed -- informed they were not allowed to return to
9      campus and they disputed the decision, is that person
10     informed that they can request a hearing on that
11     decision?
12  A.  I have to go -- in terms of speculation, I have not
13     had -- I can only go based on cases that I had where
14     there was absolute proof that the information was
15     true, and we've spoken in that situation how it
16     handle- -- and in all instances, I've responded in a
17     consistent way.
18            If they've questioned it, as has been the
19     case with Mr. Branch, then we allow them to provide
20     information to dispute that.
21  Q.  Provide information to your office, which would then
22     review it with the team?
23  A.  In his case, he was instructed he needs to take it to
24     campus safety.  And campus safety, again, the director
25     is a member of the BIT team, and then we meet and we

Page 48

1      look at this additional information to determine
2      whether or not we need to change any of our actions or
3      gather additional information.
4  Q.  And are students informed of the decisions made after
5      additional information has been submitted?
6  A.  Yes.
7  Q.  How are they informed?
8  A.  Well, in this particular instance, I phoned
9      Mr. Branch.  Mr. Branch and I spoke by phone.  I'm not
10     sure if he called me or I called him.  We spoke after
11     the additional information was submitted.
12  Q.  So if a person is expelled or not allowed to return to
13     campus because of a safety risk, the determination has
14     been made --
15  A.  Yes.
16  Q.  -- does that person have a right to a hearing, as you
17     understand Henry Ford Community College's policy?
18  A.  Do they have a right to a hearing?
19  Q.  (Nods head in the affirmative.)
20  A.  In the conduct policy, it identifies an appeals
21     process.  The appeals process would come following our
22     statement to act based on potential threat of the
23     safety and welfare of the campus.
24            It's a clear outline of an appeal that must
25     be submitted within a certain number of days if that

Page 49

1    student feels that their due process rights were
2    violated, if they feel as though the sanctions were
3    too harsh, and there are other stipulations.
4         He was provided with that student code of
5    conduct with the letter, and he didn't follow through.
6    Q.  I'm asking you -- that's not what I asked you.
7         What I asked you was, when you made a
8    determination to dismiss a student because of safety
9    risks or to not allow them back on the campus, are
10   they informed that they have a right to a hearing?
11   A.  Through the student code of conduct process, through
12   the document, absolutely.
13   Q.  So they're informed because they're given a copy of
14   the due process and student code of conduct policy,
15   right?
16   A.  They're in- -- absolutely.  That provides them with
17   every piece of information they need to know, and that
18   way it's not different.  It's consistent information
19   all the time.
20   Q.  Do you provide them with any additional information
21   about that appeals process or a hearing?
22   A.  No.  It's spelled out -- the appeals policy and the
23   whole procedure step by step is in that document.
24        (DEPOSITION EXHIBIT NO. 2 MARKED
25        FOR IDENTIFICATION at 12:05 p.m.)

Page 50

1    BY MR. GODWIN:
2    Q.  You've been handed Exhibit 2.  Can you tell me what
3    Exhibit 2 is, if you know?
4    A.  Uh-huh.  On the front page I see -- it says "Henry
5    Ford Community College Student Conduct Policy and Due
6    Process Procedure."
7    Q.  And I'm just going to direct your attention to --
8    maybe I -- actually, can I see that for a moment?
9    A.  Sure.
10        MR. GODWIN:  My printer made an error and
11   I'm going to remove the last page of this.  This is
12   not part of the exhibit.  Excuse me.
13   BY MR. GODWIN:
14   Q.  If I could direct you to the last page, there's an
15   effective date 4-30-04?
16   A.  Yes.
17   Q.  Do you know if this policy has changed at all since
18   that time or...
19   A.  We actually have had it reviewed by our senate and
20   they chose not to make changes.
21        (DEPOSITION EXHIBIT NO. 3 MARKED
22        FOR IDENTIFICATION at 12:07 p.m.)
23   BY MR. GODWIN:
24   Q.  I've handed you what's been marked as Exhibit 3.  If I
25   can direct your attention to Page 13 of this document,

Page 51

1    the last page...
2    A.  Uh-huh.
3         Uh-huh.
4    Q.  There's an effective date on that page of 8-23-2004?
5    A.  Yes, uh-huh.
6    Q.  Do you know which policy was -- which student conduct
7    policy or due process procedure was in place when
8    Mr. Branch was expelled or not allowed to return to
9    campus?
10   A.  What we have in our office is most recent, so what we
11   send is the most recent.  And students might be able
12   to go and find in offices around campus older
13   policies, but the official updated is in my office.
14   Q.  Do you know the last time it was updated?
15   A.  Obviously this was before I came.  Again, senate
16   reviewed -- because I requested that they review again
17   the policy.  Any time there are changes to anything
18   substantive other than something related to this
19   misspelling, grammar, those have to go to the board.
20        There was never any change since this
21   policy that was made of substance in terms -- to
22   change any of the terms, not since I've been there,
23   but it has been reviewed.
24        MR. TUKEL:  Let's go off the record for a
25   sec.

Page 52

1         (Recess taken at 12:09 p.m.)
2         (Back on the record at 12:23 p.m.)
3    BY MR. GODWIN:
4    Q.  Can you describe to me the disciplinary process at
5    Henry Ford and how that works?
6    A.  Uh-huh, yeah.  The standard disciplinary process
7    involves receiving notification of a possible code of
8    conduct violation.  The information's reviewed, and
9    either I or campus safety say the student should be
10   charged for this violation.
11        The student is sent a charge letter.
12   They're given a certain time period to respond, it
13   must be a writing.  Then they have to pick their due
14   process option.  And after that, a -- whether they
15   waive a hearing or request a hearing will determine
16   the action.
17        If they request a hearing, then the hearing
18   is held, and at the end of the hearing a decision is
19   made based on the hearing and any other relevant facts
20   pertaining to it.
21   Q.  And if they're not satisfied with that decision from
22   the hearing or the -- I guess the waiver, if there's
23   a -- of the hearing, then they can appeal.  Is that
24   correct?
25   A.  Yeah.  They're given -- every letter that goes out,

Page 53

1   whether it's safety or discipline, they get a copy
2   of -- the student code of conduct is sent along with
3   it and it identifies everything they need to know,
4   including the appeal process, how to do it and that
5   sort of thing.
6   Q.   And is there set people that are always on the -- or
7   typically always on the hearing -- the committee that
8   does the hearings?
9   A.   Only people who are trained, and it depends.  It's
10  either myself or a designee.
11  Q.   What other persons?
12  A.   That's it.  Just myself or a designee, anyone who's
13  been trained through the process.
14  Q.   They hold the hearing?
15  A.   They will hold a hearing, uh-huh.
16  Q.   And at the appeal stage, who are the people that are
17  on that panel?
18  A.   Uh-huh, yeah, that's -- different people, but --
19  Q.   Whom do you remember serving in that capacity?
20  A.   There have been a variety of people since I've been at
21  the college.  I can only tell you the positions.
22  Q.   Oh, okay.
23  A.   They're specific outlined.
24  Q.   They're outlined in the --
25  A.   In the procedures, yeah.  There are three students and

Page 54

1   then there are three employees and an administrator.
2   I'm looking specifically in here to see who must be on
3   it.
4   Q.   You said that a student expelled or not allowed to
5   continue their enrollment because they were a threat
6   to -- determined to be a threat to campus safety by
7   yourself, that they have appeal rights.
8   A.   They have appeal rights.
9   Q.   Do they have a hearing right?
10  A.   When?
11  Q.   Do they have a right to a hearing?
12  A.   If in fact -- okay.  If in fact a student files for an
13  appeal, they request an appeal, the judicial board
14  determines whether or not they will hold a hearing
15  based on the evidence provided, if their due process
16  rights were violated and that sort of thing.  It
17  outlines that in the document why they may grant an
18  appeal or not grant an appeal.
19       In a safety issue, we have not had a
20  hearing when this evidence is clear.
21       In this particular case, we have not had a
22  hearing ever for these restrictions.
23  Q.   How did the charge letter that you send for a person
24  that's no longer allowed to continue their enrollment
25  due to a campus safety determination versus the

Page 55

1   disciplinary process?
2   A.   I don't understand what you mean.
3   Q.   I'll ask you a different question.
4        If a charge has been made and charge letter
5   has been sent and you've received a response from the
6   student requesting a hearing...
7   A.   Uh-huh.
8   Q.   What is the difference between -- strike that, I'm
9   going to ask you a different question.
10  Persons that are given a charge letter and
11  are not subject to immediate expulsion due to the
12  safety risk, they're provided the option of having a
13  hearing.  Is that correct?
14  A.   That's correct.  As long as they don't pose a safety
15  risk, yes.
16  Q.   A person that is determined to be a safety risk does
17  not have a right to a hearing like a person that
18  hasn't been determined to be a safety risk.  Is that
19  correct?
20  A.   Correct.
21  Q.   And why is that?
22  A.   If they're determined to be a safety risk because of
23  evidence like in this situation, we have the
24  information and we make a decision based on facts that
25  this person poses a safety risk to the campus, and we

Page 56

1   then at our discretion indicate that that student
2   cannot be on the campus.
3   Q.   Does the charge letter that you send to people who
4   have a right to a hearing, is it different than the
5   letter that you send to students that are a safety
6   risk, in that students that are -- have a right to a
7   hearing are informed they have a right to a hearing in
8   that letter and how they can request that hearing --
9   A.   Yes.
10  Q.   -- and how many days they can --
11  A.   Yes.
12  Q.   -- have to respond, while the student that is
13  determined to be a safety risk is not informed in the
14  letter they receive of a -- any right to a hearing or
15  appeal, is that correct, and how to make that appeal?
16  A.   In the letter?
17  Q.   Yes.
18  A.   We don't indicate in the first circumstance, with the
19  discipline nonthreat, the student has a right to
20  appeal in that.  What we do is send the copy of the
21  student code of conduct policy that outlines all of
22  that.
23       In the safety issue, this is sent, and yes,
24  the letter looks different.
25  Q.   So you don't inform -- nonsafety risk students that

Page 57

1    are informed of -- informed of a charge, you don't --
2    in that letter that you send them, you don't tell them
3    that they have seven days to respond and --
4    A.  We do.
5    Q.  In the letter, okay.
6    A.  In the letter, yes, we outline specifically timelines
7       for response to the charge letter for the hearing.  We
8       don't in that charge letter identify anything related
9       to appeal.
10   Q.  Right, because they don't have a right to appeal
11      unless they request a hearing.
12   A.  Correct.  They don't have to request a hearing, but --
13   Q.  Or they dispute the discipline imposed --
14   A.  Absolutely.
15   Q.  -- after they waive the hearing.
16   A.  Absolutely.
17   Q.  Why is it that safety risk -- students that you've
18      determined to be a safety risk aren't entitled to an
19      actual hearing?
20   A.  In this situation, in all situations just like this,
21      we -- the facts that we review are those items that
22      prevent a person from being on campus.  Those are
23      already not in dispute.
24          The only point of a hearing is to determine
25      whether or not the information is true.  We've already

Page 58

1    identified it is true, they are a safety risk, and in
2    every case, we have responded exactly the same way.
3    Q.  So a student that is determined to be a safety risk
4       because they have been charged with a felony, that
5       person does not have the right to a hearing.  Is that
6       correct?
7    A.  You're saying charged, just charged.
8    Q.  Charged and determined to be a safety risk.
9    A.  That's correct.
10   Q.  They don't have a right to a hearing.
11   A.  That's correct.
12   Q.  And that's because you've already made the decision
13      that the facts are -- you've made the decision that
14      the facts are what the facts are.
15   A.  I or -- this is done with BIT team.
16   Q.  But in the end, you're the person who is responsible
17      for the decision --
18   A.  For sending the letter, yes, absolutely.
19   Q.  As the vice president, you're in charge of determining
20      the course of action that any disciplinary or other
21      matter related to the student code of conduct should
22      be handled, correct?
23   A.  That's correct.
24   Q.  So in the end, any decision made is your decision.
25   A.  Absolutely.

Page 59

1    Q.  After -- whether you're advising -- whether you're
2       taking advice from another team or legal counsel or
3       anything, it's your decision in the end.
4    A.  Absolutely.
5    Q.  And the only way that that student who's determined to
6       be a safety risk would be informed of their right to
7       appeal is through the -- receiving a student conduct
8       policy and due process procedure from your office with
9       that letter informing them of your decision.
10   A.  Correct.
11   Q.  And where -- where -- to your understanding, where is
12      that appeal to be sent?
13   A.  It identifies in here where that is to be sent.
14   Q.  And you're referring to the student conduct policy and
15      due process procedure?
16   A.  Correct.
17   Q.  And do you know where that is?
18   A.  Yeah.  It's sent by mail to my office, and then it's
19      forwarded to the judicial chair.
20   Q.  And that's in the student conduct policy and due
21      process procedure that it's to be sent to your office?
22   A.  Correct.
23   Q.  And is there a time period?
24   A.  Yeah.  It outlines it in here, yes.
25   Q.  What is the time period for appealing from a decision

Page 60

1    where you determine they're a safety risk and no
2    longer able to continue enrollment?
3          MS. HUSBAND:  Do you --
4    BY MR. GODWIN:
5    Q.  No, I'm just asking you do you know.
6    A.  Well, I'd have to go back and refresh my memory
7       because I have to -- every time?
8    Q.  I mean is there a time period?
9    A.  I indicated that there was already.
10   Q.  For appeals.
11   A.  For appeals, yes.
12   Q.  But there's no right to appeal spelled out in the
13      letter that you send a student that you've
14      disciplined -- or not disciplined, excuse me -- have
15      determined is a threat to the campus safety and
16      they're no longer able to continue enrollment.
17   A.  Not in the letter, no.
18   Q.  All right.  After you -- after you sent Mr. Branch the
19      letter, what was the next thing that happened in
20      regards to his situation?
21   A.  The next thing that happened that I did?
22   Q.  Next thing that happened at all in relationship to
23      the -- to his case after you sent that letter to him.
24   A.  Uh-huh.  After the letter was sent and even before the
25      letter was put in the mail, the -- I asked campus

Page 61

1  safety to contact him directly to let him know he
2  couldn't be on campus, and if he had any questions, he
3  was going to be getting a copy of the letter in the
4  mail and for him to contact my office.
5  Q.  Did you find out if they made contact?
6  A.  I did not, no.
7  Q.  Who did you ask to contact him?
8  A.  I asked the director at the time to have one of his
9  supervisors contact him.
10  Q.  And what happened after that?
11  A.  I know that Mr. Branch called my office, and I'm not
12  sure if he called prior to me knowing that he called,
13  but one of the times that he called was a day or so
14  after I -- we put the letter in the mail, and he
15  indicated that he was informed he was kicked out.  And
16  I spoke to him about why, and he indicated that he
17  would -- you know, we talked about restrictions, and
18  he indicated that -- you know, what were the
19  restrictions, and I indicated to him the ones that
20  were in conflict with him being on campus.
21        Then he said something about, well, other
22  people are on campus with these restrictions, and I
23  indicated to him that, you know, these individuals
24  have not come to our attention, you have.  And I
25  indicated that there was a complaint made against him,

Page 62

1  and that's how he came to our attention.
2        And then he indicated, well, that he was
3  going to talk to his parole agent -- yeah, that he was
4  going to talk to his parole agent, and so I indicated
5  that if he had any information, he can go to campus
6  safety and drop it off because he wasn't supposed to
7  be on campus.
8        And then a few days later, I got -- campus
9  safety dropped off a form from Mr. Branch's parole
10  agent where it indicated an exclusion of a couple of
11  the restrictions.  I believe it was about the schools
12  or the child care or something, but it was a couple
13  restrictions that were -- that he signed off.
14        So I called -- I told my assistant to keep
15  the hold on Mr. Branch's records, but not to drop him
16  from classes because he indicated that there was some
17  information he could provide.
18        So when we got the document, I called the
19  BIT team back together, and I indicated that
20  Mr. Branch had gone to campus safety and I -- Karen
21  Schoen was our supervisor at the time, and that I
22  think he had spoken to her or had given her the
23  document, and she got it up to us and she indicated
24  that, you know, he wanted us to have it right away.
25  So we reviewed it, and it showed that the parole

Page 63

1  officer asked to exclude those restrictions.
2        So Mark Weimerskirch, who was the interim
3  director of campus safety at the time, indicated,
4  well, why did he remove the restrictions, and I said I
5  don't know.  Well, you need to call and find out why
6  the restrictions were removed, and I indicated fine,
7  we'll do that.  And then after that, I mean I'll let
8  you know.
9        So I called Mr. Branch's parole officer,
10  and I indicated that he had dropped this off and I was
11  wondering why he removed the restrictions, and he
12  says, well, what do you mean why I removed them.  And
13  I said, well, did Mr. Branch -- are these no longer
14  relevant for Mr. Branch, meaning has he gone through
15  an educational program, has he gone through some kind
16  of process to make these concerns or these
17  restrictions no longer valid, and he says no.
18        And I said so what are you basing the
19  removal on, and he indicated, well, Mr. Branch wants
20  to go to school, he wants to go to school, and I
21  said but -- so that means that anything -- nothing's
22  changed from the time in which the restrictions were
23  placed on the document and then removed, and he said
24  no.
25        And I said -- and he says, well, look, if

Page 64

1  you don't want him on campus, just let me know and
2  I'll let him know that you don't want him there.  And
3  I'm like, well, you know, obviously we have to take
4  into consideration whether or not there was reason
5  that these restrictions were removed, and he said
6  well, I get it, I understand, you know, the guy just
7  wants to go to school.
8        So I called BIT back together, and then we
9  reviewed the information, and I gave Mark Weimerskirch
10  the information and like the parole officer's name in
11  case he wanted to follow up with him.
12        And then we said, you know, honestly -- the
13  group agreed, and I was looking for counsel from the
14  team, but we agreed that if there were -- there was no
15  difference from the time in which these restrictions
16  were placed on the document, that there was no
17  educational programming, there was no -- I don't know
18  if you want to call it remediation or something like
19  that except for the fact that he just wanted to go to
20  school.  We could not accept that as rationale to
21  remove his restrictions and to allow him to come back.
22        So I'm not certain if Mr. Branch called my
23  office again to find out what was going on since he
24  dropped off the document or if I called him, but we
25  spoke again, and I indicated to him, you know, I know

1  you dropped off the document, but that is not enough.
2  He can't -- the parole officer -- from our
3  perspective, we need to know that whatever risk we saw
4  in the beginning is no longer a risk, and your parole
5  officer actually indicated there was no reason to
6  remove the restriction except for the fact that you
7  wanted to go to school.
8          Did you have a question or should I
9  continue?
10 Q.  Yes, I do have a question.
11         The parole agent removed the restriction
12 that was at issue?
13 A.  I'm sorry?
14 Q.  Did the parole officer remove the restriction that was
15 at issue for Mr. Branch being able to attend the
16 school?
17         The parole officer -- you got paperwork
18 indicating that the parole officer had removed
19 restrictions.  Is that correct?
20         MS. HUSBAND:  I'd just object to --
21 BY MR. GODWIN:
22 Q.  Or modified restrictions of his parole conditions?
23         MS. HUSBAND:  The modified parole
24 restrictions are the best evidence of that.  That
25 document speaks for itself.  I don't know if she has

1  recollection of what that document says and you've not
2  provided it to her to ask the question.
3  A.  No.
4  BY MR. GODWIN:
5  Q.  You received a letter from Michael Branch's parole
6  agent modifying restrictions.  Is that correct?
7  A.  I received a document, yeah, from someone who signed
8  the document, and they indicated that these -- that
9  they were going to exclude these restrictions.
10 Q.  And you later followed up and determined that this was
11 from Mr. Branch's parole agent.
12 A.  I did.
13 Q.  And that they had -- he had modified the parole
14 restrictions.  Is that correct?
15 A.  That's correct.
16 Q.  Do you recall what he modified?
17 A.  I don't recall which ones he modified.  I don't.
18 Q.  The parole restrictions, you know, in attending school
19 at Henry Ford Community College in your opinion was
20 not possible for Mr. Branch and that he was violating
21 his parole restrictions by attending the school.
22 A.  Uh-huh, okay.
23 Q.  Is that correct that he was violating his parole
24 restrictions by attending the school?
25 A.  That's correct.

1  Q.  And that is what you discussed with the BIT team and
2  made your decision based on.  Is that correct?
3  A.  In part.
4  Q.  What's the other part?
5  A.  Whether or not overall he was a safety risk.  The
6  conditions of the parole happened to be why we
7  considered him to be a safety risk, and everything we
8  did subsequent was to determine whether or not that
9  would still be the case.
10 Q.  What about the parole restrictions indicated he was a
11 safety risk?
12 A.  That he could not be within a certain number of feet
13 of a child care center or a school or an interaction
14 with anyone under the age of -- anyone who's underage,
15 a child.
16 Q.  What other facts did you consider?
17 A.  That's it.
18 Q.  So the fact that the parole restrictions were in place
19 is what you considered to determine that he was a
20 safety risk.
21 A.  We used that to determine, yes, very clearly.
22 Q.  The parole agent, you verified that he had modified
23 the conditions to allow Mr. Branch to attend the
24 school --
25 A.  Uh-huh.

1  Q.  -- but in your opinion --
2          MS. HUSBAND:  I have to place an objection
3  because I think that mischaracterizes what the
4  testimony was, that she doesn't recall what the
5  modifications were, and your question assumes that the
6  modifications allowed him to then be able to be on
7  campus, and I don't believe that that's been set forth
8  in the record.
9  A.  Uh-uh.
10 BY MR. GODWIN:
11 Q.  You spoke with the parole agent who indicated that he
12 made the modifications --
13 A.  Uh-huh.
14 Q.  -- because Mr. Branch had been attending the school --
15 A.  Uh-huh.
16 Q.  -- and wanted to continue to attend the school.
17 A.  Yes.
18 Q.  And that is why he modified the parole conditions.
19 A.  Correct.
20 Q.  And the reason that you decided -- when you met with
21 your team and discussed it, the reason you decided
22 that modifications of these parole conditions weren't
23 good enough is because the parole agent hadn't
24 provided you with any justification for why he had
25 made them, made those changes, other than the fact

Page 69

1  that Mr. Branch was attending school and wanted to
2  continue to attend school, correct?
3  A.  In part, yes.
4  Q.  What's not correct?
5  A.  What we did -- and this is what was asked of the
6  parole agent; has he done anything that indicates that
7  there is no further need to have these restrictions in
8  place.
9        The reason for asking that question to
10  bring back to the BIT team was to determine for us did
11  he still pose a threat to the campus.
12        When we looked at the fact that there was
13  no reason that the agent would remove the parole
14  restrictions based on any education or remediation or
15  anything which made him less of a risk and the only
16  reason given was that he wants to go to school, we
17  still decided that there was a risk here.
18  Q.  Because of the prior -- because of previous
19  restrictions that were in place before you got that
20  notification that they had been modified.
21  A.  Correct.
22  Q.  Okay.  And so at that time did you make the expulsion
23  permanent?
24  A.  At that point I called -- like I said, Mr. Branch and
25  I spoke.

Page 70

1  Q.  Okay.
2  A.  I don't know if he called finding out what was going
3  on or I called him or whatever, but I indicated, yes,
4  we did get it, got the information, and here's the
5  situation.  He can't remove the restrictions, and for
6  our purposes in that, we are looking at a potential
7  concern or risk to the campus, and he didn't -- he
8  only indicated that he removed them because you wanted
9  to go to school, which I understand, I get that.
10        And, you know, at that point, he said,
11  well, I started all these classes -- Mr. Branch -- you
12  know, I started these classes, and I said, you know,
13  and -- at that point, I said, well, if you wanted to
14  know how the college would have dealt with this before
15  you started taking classes, why didn't you go to
16  campus safety and report your background or history or
17  whatever.  At that point they could have -- I
18  indicated that for you.
19        Well, that wasn't required, it's not part
20  of the application process.  I said, I know, I get
21  that, but that is the way for you to have found out,
22  but at this juncture, we don't have any -- there's
23  nothing I can do.  We don't have any evidence that
24  contradicts our decision, and so we'll have to go
25  forward, but I am willing to meet with our -- you

Page 71

1  know, our academic faculty had gotten permission
2  already to -- from our vice president of academic
3  affairs that they would be willing to -- whatever
4  school he chose, to review his credits to make sure
5  that they transferred seamlessly into a program at
6  another school if he found the same one.
7        And, you know, essentially that was the end
8  of the conversation.
9  Q.  And you sent him a letter outlining this final
10  decision or final determination, or no?
11  A.  Okay.  No.  This letter essentially indicated that --
12  Q.  No, I'm not asking about --
13  A.  No, there was no letter sent.  There was no additional
14  letter sent, no.
15  Q.  Okay.  At that point was the expulsion final?
16  A.  That was closed, yeah.
17  Q.  On the day that you had that conversation.
18  A.  Yes.
19  Q.  Do you know what day that conversation took place?
20  A.  I'm not sure.  It would have been a couple days after
21  I got the form from his parole officer.
22  Q.  Did you tell Mr. Branch that he could attend school
23  when he got off parole?
24  A.  No.
25  Q.  Did you have a conversation with Mr. Branch about

Page 72

1  what -- you know, if he gets off parole, can he come
2  back to school?
3  A.  No.  I don't recall talking to him about what if he
4  gets off parole or anything.  I was talking about this
5  situation.
6  Q.  Would the same concerns that you had regarding the
7  restrictions still apply -- still apply after parole
8  is finalized?
9  A.  I don't understand the question.
10  Q.  Mr. Branch was released from prison on parole.
11  A.  Okay.
12  Q.  He was placed -- given restrictions.  At some point a
13  person typically is released from parole.
14  A.  Okay.
15  Q.  Would the concerns that you had about Mr. Branch still
16  having had parole conditions, still apply after
17  he's -- parole is finalized?
18  A.  What concerns are you talking about?
19  Q.  The concerns regarding having conditions placed on
20  him, having had legal restrictions placed on him.
21  A.  Okay.  You know, the reason why I asked that question
22  is, you know, if a student is asked to step out for
23  any reason, we then have to review -- it's considered
24  a reinstatement, and any time there's a reinstatement,
25  we have to review a number of factors in terms of

Page  73

1    whether or not that student is then eligible to
2    reenroll.
3    Q.  Is there a written policy on reenrollment for an
4        expelled student?
5    A.  Is there a written --
6    Q.  A written policy on students that have been expelled
7        and seek to reenroll?
8    A.  This is a -- you know, essentially a process that --
9        to make sure that we are being consistent with the BIT
10       team.  If there is any reinstatement given for any
11       student who was at one point asked not to enroll for a
12       safety concern, then meet and make that
13       determination and --
14   Q.  Would -- have you ever had a person that's been
15       expelled for parole conditions return and seek
16       reenrollment?
17   A.  In the same circumstance?
18   Q.  Any student with parole restrictions that was expelled
19       seeking reenrollment.
20   A.  Again, I want to know -- yeah, we have had someone who
21       was expelled for safety concerns who sought it, yes.
22       Again, I have to go based on specific cases, not on
23       speculation.  There are so many factors involved.
24   Q.  How do they apply for reenrollment?
25   A.  They send a letter requesting to be considered, and

Page  74

1    again, if it's a safety issue, we call the BIT team
2    together and we look at the same kind of standard, you
3    know, issues in terms of potential safety risk to the
4    campus.
5            We also -- for reinstatement, we go back
6    and review our admissions procedures that requires us
7    to make a determination and gives us the authority
8    to -- it's a term I'm looking for -- prevent someone
9    or to deny someone admission.
10   Q.  If a person who is expelled for safety reasons
11       attempts -- attempted to reenroll in the school let's
12       say on-line, would you be notified that they submitted
13       an application?
14   A.  Yeah.  They wouldn't be able to enroll without being
15       approved to be reinstated.
16   Q.  Is that reenrollment process, do you know of anywhere
17       where that's available to students or former students
18       or the public that that process exists?
19   A.  Are people in the public notified of our reenrollment
20       process?
21   Q.  That there is one.
22   A.  Not that I'm aware.
23   Q.  How would anyone know that a reenrollment process
24       existed beyond being denied when applying or calling
25       your office?  How would a person know of the existence

Page  75

1    of that?
2            Would a person -- could a person know of
3    the existence of it from any source other than your
4    office or --
5    A.  Okay.  Let me --
6    Q.  Let me just -- do you know of anywhere that -- where
7        it's written on the web site or any booklets or
8        anywhere that there is a reenrollment process?
9    A.  No.  If you -- no, it's not.  And the fact of the
10       matter, if a final decision has been made -- which
11       this was, this letter was, March 9th -- if a final
12       decision has been made and the student does not appeal
13       that final decision, there is no looking back.
14           What we have done as a means of being
15       compassionate is if people ask enough, we give
16       everybody an opportunity, and that's what happened in
17       Mr. Branch's case.
18   Q.  Okay.  So when Mr. Branch responded to your final
19       decision in that letter of March 9th, was that an
20       appeal or was that a reconsideration, or what was
21       that?
22   A.  In his situation, I wanted him to feel he had a voice.
23       I didn't have to, and in that particular circumstance,
24       if anyone were to say I've got something else, I give
25       them an opportunity to show that something else.  Even

Page  76

1    though the facts are clear and we had a right to react
2    and provide this, I give -- I give them that
3    opportunity.  But if in fact the information they
4    provide doesn't -- is not any information we can use
5    to make a different decision, it stands.
6    Q.  And it stands even if somebody's seeking reenrollment.
7    A.  In that situation -- the reason why I can't explain to
8        you that there is any policy on reenrollment, after a
9        final decision is made on enrollment, an expulsion, a
10       dismissal, and the person hasn't gone through the
11       appeal process, they're done.  There is no policy to
12       allow them.
13           People have asked and have we given a deaf
14       ear?  No.  We have not given a deaf ear, but there
15       would have to be something major.
16   Q.  Did Mr. Branch's appeal date, his date to appeal from,
17       start with that March 9th letter, or did it start with
18       the conversation you had with him after he provided
19       some more information about his parole restrictions
20       being modified?
21   A.  Based on our consistent practice, as of the date of
22       this letter, March 9th, 2011, because honestly the
23       information he was going to provide that we looked at
24       should have been something he should have provided the
25       appeal committee.

Page 77

1    Q.  Who was on the judicial board at the time of
2        Mr. Branch's expulsion?
3    A.  I'm not in charge of that board.  That is an
4        independent board.  I'd have to go back and look at
5        the specific people who were on it.
6    Q.  Who runs the judicial board?
7    A.  An administrator is assigned, and this again by the
8        faculty senate.  We know that there's an administrator
9        who chairs it.  There are three faculty and three
10       students.  Students come from student council and they
11       can't know the person involved.
12   Q.  Who -- what is the address of the judicial board?
13   A.  There is no address.  We have a senate chair who
14       appoints -- well, there's -- who is in charge of --
15       who will serve on it from faculty to make sure it's
16       independent.  I can get you the name and the phone
17       number of our senate chair to explain that process to
18       you further.
19   Q.  How does a student know how to contact the judicial
20       board?
21   A.  If in fact a student applies or requests an appeal,
22       they send the letter requesting the appeal, then I
23       contact the senate chair.
24           The senate chair then notifies the student
25       that they have requested an appeal, that they now have

Page 78

1        it, that they're going to be forming this committee,
2        and then they're then informed of what they need to
3        bring, what their rights are.  They're given another
4        copy of this and then notified, if they have
5        additional questions, who to contact.
6    Q.  So they have to submit the appeal to you.
7    A.  Uh-huh, yes.
8    Q.  In Mr. Branch's case, you didn't inform him in that
9        letter that he was to submit an appeal to you.  Is
10       that correct?
11   A.  I stated that several times, yes.
12   Q.  Right.  You did not give him any information that he
13       could appeal in that letter.
14           MS. HUSBAND:  I'm going to object.  I think
15       that mischaracterizes the letter and her testimony.
16       She states that the letter and her testimony was that
17       it references the student code of conduct policy,
18       which was included with the letter.
19   BY MR. GODWIN:
20   Q.  Your letter does not say that he has a right to
21       appeal, does it?
22   A.  My letter?
23   Q.  Your letter of March 9th.
24   A.  No, it does not.
25   Q.  For students that have been given a hearing and are

Page 79

1        unhappy -- or are given a hearing, how are they
2        informed -- excuse me.
3            When students have been given a hearing, a
4        decision has been reached, how are they informed of
5        how to make an appeal?
6    A.  Again, any student that receives a charge letter,
7        they're given the student code of conduct where it
8        outlines everything from the process, any policies,
9        and it also includes the appeal process.  That's their
10       information.  They're given the letter at the
11       beginning and it outlines all of that, and there are
12       students who do appeal decisions.
13   Q.  Where in the due process procedure does it say that an
14       appeal -- where an appeal is to be sent to?
15           MS. HUSBAND:  Just for the record, which
16       exhibit number are you looking at?
17   A.  Oh, I'm sorry, yeah, I'm going to have to -- okay.
18           (Off the record at 1:13 p.m.)
19           (Back on the record at 1:13 p.m.)
20           THE WITNESS:  It is Number 3, yes.
21   A.  I don't know if I'm reading this too quickly, but I'm
22       going to have to say I don't see it in here.
23           I don't have that in here.  That's -- okay.
24       I don't see it specifically in here, but I know that
25       has always been the case, and that's where all of our

Page 80

1        requests come to.
2    BY MR. GODWIN:
3    Q.  So once the decision was final in Mr. Branch's case,
4        he could not reenroll at Henry Ford Community College
5        after his parole had been terminated, being off of
6        parole.  Is that correct?
7            Let me reask the question.
8            MS. HUSBAND:  I think she's already
9        answered that question for you a couple times.
10   A.  Uh-huh.
11   BY MR. GODWIN:
12   Q.  After Mr. Branch was released from parole, he would
13       be -- not be able to reenroll in the school.
14           MS. HUSBAND:  Objection, asked and
15       answered.
16   A.  Uh-huh.  I did ask that -- I did answer that a few
17       different ways, yeah.
18   Q.  Yes or no, or --
19   A.  I've answered that a few different ways.
20           THE WITNESS:  Do I need to answer?
21           MS. HUSBAND:  Yeah.  There's no judge here
22       to rule on the objection, so...
23   A.  Okay.  So, again, if a student has a final decision --
24   BY MR. GODWIN:
25   Q.  Let me -- let me --

Page 81

1  A.  Okay.
2  Q.  Once Mr. Branch received that March 9th, 2011 letter
3      and he failed to appeal within the time period allowed
4      under the student code of conduct, he could not
5      reenroll at Henry Ford Community College.
6  A.  You're saying he could not?
7  Q.  Yes.
8  A.  Again, vague.
9  Q.  Once the decision to expel Mr. Branch was finalized,
10     he would be unable to -- he was and is unable to
11     reenroll at Henry Ford Community College.
12         MS. HUSBAND:  You're saying you mean today?
13     I mean because it sounded like you said once could
14     have been contemporaneous with that decision.
15         Are you asking her -- at what point in time
16     are you asking the question?  Today could he do it?
17     Could he have done it back when they --
18 BY MR. GODWIN:
19 Q.  Once Mr. Branch was expelled from Henry Ford Community
20     College and the decision had been finalized...
21 A.  The due process options were done, and he was -- he --
22     this was a final decision, he did not appeal it, and
23     at that -- so, no, there was no avenue at that point.
24 Q.  He cannot reenroll at the university -- or at the
25     college.  Mr. Branch cannot reenroll at the college.

Page 82

1  A.  This is -- yeah --
2          MS. HUSBAND:  Today or then?
3  BY MR. GODWIN:
4  Q.  Any day.
5          MS. HUSBAND:  She's already asked and
6      answered that question.
7  BY MR. GODWIN:
8  Q.  Well, answer it.
9          MR. GODWIN:  I'm trying to get a consistent
10     flow here.  Usually you object, and then we continue
11     to go through -- I mean I'm not trying to hash over
12     everything a million times, but I'm trying to
13     establish a few facts, so --
14 A.  Okay.  So I'm trying to answer the question that you
15     are asking, okay.
16 BY MR. GODWIN:
17 Q.  All right.
18 A.  So at that time, this was the decision.  I gave him an
19     opportunity --
20 Q.  Okay.  Let me ask the question.
21 A.  Okay.
22 Q.  After Mr. Branch was expelled, the decision was
23     final --
24 A.  Yes, okay.
25 Q.  -- he cannot -- he cannot reenroll at Henry Ford

Page 83

1  Community College.
2  A.  That's correct.
3          (Off the record at 1:20 p.m.)
4          (Back on the record at 1:20 p.m.)
5  BY MR. GODWIN:
6  Q.  After the point that the decision was final,
7      Mr. Branch could not reenroll at Henry Ford Community
8      College.
9  A.  Correct.
10 Q.  I'm going to refer you to Exhibit Number 1.
11 A.  Uh-huh.
12 Q.  Can you tell me what that number is at the top that
13     reads 11-193?
14 A.  Correct, 11-193.
15 Q.  What is that number, if you know?
16 A.  What is that number?
17 Q.  What is that number?
18 A.  I have no idea.  I didn't put it down there.  It's not
19     my handwriting.  I don't know what it is.
20 Q.  How do you keep records of expulsions for safety
21     reasons?
22 A.  We have copies and files in my office, and campus
23     safety also keeps records.
24 Q.  And are those files kept separately from students that
25     were not determined to be a safety risk, but where

Page 84

1  discipline was charged or -- let me ask the question
2  again, sorry.
3          Are all of the disciplinary and expulsion
4  files, are they all filed together or are they kept
5  separately depending on whether a complaint was made
6  versus whether you decided to take action and hold a
7  hearing or not -- or issue a charge or not issue a
8  charge -- sorry, let me rephrase.
9          Can you tell me how the disciplinary files
10 are kept in your office?
11 A.  Uh-huh, yeah.  We have electronic copies and we also
12     have hard copies of files, all including any
13     documentation there in my office, and yeah, they are
14     separated for nondisciplinary, for behavioral
15     intervention team, so BIT files; and then for
16     disciplinary files.
17 Q.  Were you ever made aware that the sex offender
18     registry was searchable by educational institutions?
19          Are you familiar with the sex offender
20     registry?
21 A.  I am familiar, yes.
22 Q.  Did you ever at any time learn that you could search
23     the sex offender registry by school or college?
24 A.  Who me?  That I can do it?
25 Q.  Yes.

Page 85

1    A.  That I can do it?
2    Q.  Yes.
3    A.  No.
4    Q.  Does your -- do -- is a student required to disclose
5        whether they're on parole when they apply for -- to be
6        admitted to Henry Ford Community College?
7    A.  No, they're not.
8    Q.  Are they -- is a student required to report to campus
9        safety when they're considering attending a school
10       when they're on parole?
11   A.  They're not required, no, not by us.  We don't require
12       it.
13   Q.  You have an open enrollment policy at Henry Ford
14       Community College.  Is that correct?
15   A.  We don't consider it necessarily open.  We do require
16       a high school diploma or GED.
17   Q.  With the exception of a high school diploma, is there
18       any other requirements to attend the school?
19   A.  There might be some exclusions in the process of the
20       admissions policy, yes; that admission could be denied
21       for an individual who got into the institution
22       fraudulently by presenting false documents of their
23       credential, or if the student is deemed to be a safety
24       risk to the campus, they can be denied admission.
25   Q.  Are admission applications reviewed for safety risks?

Page 86

1    A.  No.  They're reviewed for credential.
2    Q.  You told Mr. Branch that he should have reported the
3        fact that he was on parole to the campus safety
4        department when he first enrolled.  Is that correct?
5    A.  I told him --
6    Q.  Did you tell Mr. Branch that he should have reported
7        to campus safety that he was on parole at the time he
8        was admitted?
9    A.  When he was admitted, did I tell him?
10   Q.  Sorry.  Let me clarify and rephrase.
11       You had a conversation with Mr. Branch
12       after you reached your decision to expel him, and on
13       one of those conversations, you told him that he
14       should have reported the fact that he was on parole to
15       campus safety.  Is that correct?
16   A.  Okay, we had that conversation.  I told him not that
17       he should have.  I told him -- he said I've spent all
18       this time, why didn't you tell me before I spent all
19       this money.  I had to get loans, I had to get all this
20       money, and I've done really well in school, look at my
21       academic record.
22       And I said to him that he understood what
23       his restrictions were.  Again, we didn't go after
24       looking for you.  We only imposed this for people who
25       are brought to us by certain behavior.  That's the

Page 87

1    only reason why we even knew you were here.
2        I said if you wanted to know whether or not
3    it would be a problem for you to have been here, why
4    didn't you go when you started.  When you applied to
5    the college, why didn't you go to campus safety.  You
6    could have then prevented that.
7        So that was the conversation.  That would
8    be something -- he knew what his restrictions were.
9    Campus safety would have been the perfect place to
10   find out if there was anything going on that would
11   have prevented him from being there.
12   Q.  Are you aware that people that are on parole have to
13       obtain permission from their parole agent to do a
14       number of things, including attend school?
15   A.  Absolutely.  Absolutely.
16   Q.  And are you aware that people that are on the sex
17       offender list have to report to a law enforcement
18       agency that they're attending a school?
19   A.  I didn't know that.
20   Q.  Are you familiar with Tyrone Jermaine (sic) Davidson?
21   A.  That name sounds familiar.
22           (DEPOSITION EXHIBIT NO. 4 MARKED
23            FOR IDENTIFICATION at 1:29 p.m.)
24   BY MR. GODWIN:
25   Q.  Handing you what's been marked as Exhibit 4.  This is

Page 88

1    a printout from the OTIS, the offender tracking
2    information system, Michigan Department of
3    Corrections, regarding Tyrone Jeremiah Davidson.  Do
4    you recognize this?
5    A.  Actually, no.  Actually, I don't recognize him.
6    Q.  Do you recognize the name?
7    A.  It's a common name.
8    Q.  Was this a person that you found to be a threat to
9        campus safety?
10   A.  I'd have to go back and look at the BIT cases to
11       determine if he was sent information.
12   Q.  You send the letters informing a person of their
13       expulsion by certified mail return receipt.  Is that
14       correct?
15   A.  That's correct.
16   Q.  And do you keep a copy of the return of that receipt?
17   A.  Oh, yeah.
18           (DEPOSITION EXHIBIT NO. 5 MARKED
19            FOR IDENTIFICATION at 1:31 p.m.)
20   BY MR. GODWIN:
21   Q.  You've been handed what's been marked as Exhibit 5.
22       This is an OTIS printout, Michigan Department of
23       Corrections, for Timothy Sanders.  Do you recognize
24       that name?
25   A.  I do.  I recognize this name, yes.

Page 89

1    Q.  Do you recognize the individual in the photo?
2    A.  I'm sorry?
3    Q.  And you recognize the photo?
4    A.  He looks a bit different from when I saw him in person
5        to the photo.  I do --
6    Q.  This was a student at Henry Ford Community College?
7    A.  Yeah.
8    Q.  And he was expelled through the BIT process?
9    A.  I'd have to go back and look at this specific
10       situation, but I'm almost positive that it was the
11       same situation, exactly the same.
12   Q.  Do you know what a Pell grant is?
13   A.  Yes.
14   Q.  Can you tell me what it is?
15   A.  Uh-huh.  It's a form of assistance through the federal
16       government to allow students who are low income to be
17       able to go to school if they meet a certain financial
18       threshold.  It's a grant, not a loan.
19   Q.  And there are limitations on how many -- how much
20       money you can be granted over your lifetime.  Is that
21       correct?
22   A.  Yeah, there is.
23              (DEPOSITION EXHIBIT NO. 6 MARKED
24              FOR IDENTIFICATION at 1:33 p.m.)
25   BY MR. GODWIN:

Page 90

1    Q.  Handing you what's been marked as Exhibit 6.  This is
2        a --
3              MS. HUSBAND:  Do you have an extra one,
4        Shaun?
5              MR. GODWIN:  Oh, sorry.
6    BY MR. GODWIN:
7    Q.  Marked as Exhibit 6, e-mail with the subject "Michael
8        Branch President's Notes," from Marjorie Swan to Gail
9        Mee dated July 23rd, 2012.
10   A.  Uh-huh.
11   Q.  There's an attachment to the -- this e-mail on the
12       third page of the document, and it says "Note to the
13       Board."
14              Do you know who wrote this?
15   A.  I don't know who wrote it.
16   Q.  You know you didn't write it?
17   A.  I know I did not write it.
18   Q.  Do you remember seeing this?
19   A.  No.  No.
20   Q.  When a person is expelled from the school, they can't
21       attend on-line courses.  Is that correct?
22   A.  No, you cannot enroll.
23   Q.  What other -- do you know the name Timothy Sanders?
24   A.  Looking at this document you just gave me here.
25   Q.  Oh, that's not the --

Page 91

1    A.  This one, like I say, I don't recall.
2              (Off the record at 1:37 p.m.)
3              (Back on the record at 1:37 p.m.)
4    BY MR. GODWIN:
5    Q.  Has Henry Ford Community College made any changes to
6        its policy in regards to students that are on parole
7        with restrictions since the filing of this lawsuit?
8    A.  Have we made any changes to our policies?
9              MS. HUSBAND:  I'm going to object because
10       there's not been any -- it mischaracterizes any
11       testimony today about there being a policy.
12   A.  No, yeah.  There --
13              MS. HUSBAND:  She's talking about a
14       process.
15              MR. GODWIN:  A process.
16   BY MR. GODWIN:
17   Q.  Okay, a process.
18   A.  There's a big difference, yeah.
19   Q.  Okay.  Has there been any changes to the process for
20       dealing with students that have been expelled for
21       safety concerns related to parole conditions since
22       this lawsuit's been filed?
23   A.  No.  Anyone who has these restrictions, they are
24       treated in exactly the same way as they always have
25       been treated.  In exactly the same way.

Page 92

1    Q.  Are students that have been convicted of a prior
2        felony -- prior to their enrollment -- excuse me, I'm
3        going to rephrase.
4              Are students who've committed a felony
5        prior to their enrollment at Henry Ford Community
6        College evaluated -- I've got to start over again, I'm
7        sorry.
8              We have a process -- we had that process
9        for dealing with individuals that may be a safety
10       risk.
11              Have you ever considered a current student
12       that was previously convicted of a felony, but not
13       subject to any restrictions for -- let me ask another
14       question.
15              Does the fact that a student -- if a
16       student has committed a felony prior to their
17       enrollment, is that ever the basis for a decision
18       to -- or has that ever been the basis of a decision to
19       expel them because they might be a safety risk?
20   A.  The only time students are ever considered for
21       disciplinary action is if a charge has been brought
22       against them for behavior that occurs on the campus in
23       terms of any disciplinary.
24              So we don't know if a person has any prior
25       criminal background unless that individual's brought

Page 93

1    to us through campus safety or notification of
2    complaint.
3    Q.  What was the charge brought against Mr. Branch in this
4        case that brought him to your attention?
5    A.  There was an individual who complained about --
6             THE WITNESS:  Can I respond about what the
7        complaint was?
8             MS. HUSBAND:  I think you can respond just
9        generally of the nature of the complaint without
10       specifics that would -- just that a complaint was
11       made.
12            THE WITNESS:  Uh-huh, yeah.
13   A.  A complaint was made to campus safety.
14            MS. HUSBAND:  Because we are trying to get
15       that matter resolved through the courts, what is going
16       to be disclosed in that.
17   BY MR. GODWIN:
18   Q.  What was the nature of the complaint?
19            MS. HUSBAND:  Well, we can stipulate that
20       it was a complaint about stalking.
21   A.  Okay, yeah.  Then I -- good, because that was
22       essentially the nature of the complaint.  And
23       harassment.
24   BY MR. GODWIN:
25   Q.  Did you have any contact with the complainant?

Page 94

1    A.  Yes.  I spoke to the complainant by phone to verify.
2    Q.  Were there any other complaints made about Mr. Branch?
3    A.  No, not that came to me.
4    Q.  Did you learn about any other complaints about
5        Mr. Branch from the BIT team?
6    A.  About anything else that he's done on campus or --
7        I --
8    Q.  Yes, any other complaints.
9    A.  No, I wasn't made aware of anything.  We were
10       addressing the violations or the restrictions when we
11       came to the meeting.
12   Q.  Did you consider the underlying felony when you
13       evaluated Mr. Branch?
14            Did you consider the underlying felony when
15       you determined Mr. Branch to be a safety risk?
16   A.  We looked at the restrictions, the parole
17       restrictions, and we looked at how we've handled those
18       cases in the past, and that's what we looked at.
19       That's our process.  We look at what will prevent them
20       now.
21   Q.  So it really just was the restrictions, not anything
22       else that made you come to this decision that he had
23       to go.
24   A.  Absolutely.
25   Q.  I probably already asked you this, but I can't

Page 95

1    remember if I did or not, so I'm going to have to ask
2    it again.  I apologize.
3             Has anyone ever filed a formal appeal
4        during your time at Henry Ford to a decision you made
5        to expel them due to a safety concern?
6    A.  No.
7    Q.  Has anybody who's been through the hearing process
8        during your term at Henry Ford, have they appealed --
9        has -- have any of them filed an appeal?
10   A.  Uh-huh, yes.
11            (DEPOSITION EXHIBIT NO. 7 MARKED
12            FOR IDENTIFICATION at 1:48 p.m.)
13   BY MR. GODWIN:
14   Q.  I'm going to hand you what's been marked as Exhibit 7.
15       Can you tell me if you recognize this document titled
16       "Michigan Department of Corrections Parole Condition
17       Authorization"?
18   A.  Yes, I do, uh-huh.
19   Q.  Is that your handwriting with Michael Branch's -- it
20       says Michael Branch, a phone number, and then Mike
21       Stachowiak and a phone number.
22   A.  No, it's not my handwriting.
23   Q.  Do you remember the copy that you received having
24       those on there or --
25   A.  I do.

Page 96

1    Q.  They were on there?
2    A.  Yes.
3    Q.  And this is the document you reviewed with the BIT
4        team?
5    A.  Yes.
6             (DEPOSITION EXHIBIT NO. 8 MARKED
7             FOR IDENTIFICATION at 1:50 p.m.)
8    BY MR. GODWIN:
9    Q.  Showing you what's been marked as Exhibit 8, this is a
10       map of the Henry Ford Community College main campus.
11       Is that correct?
12   A.  I have to -- it's obviously a newer one.  The campus,
13       we've had a lot of work done on the parking lots over
14       the past few years, so this is close to the way it is
15       now.  I'm not sure -- so if you're talking about now,
16       it's close to the layout right now.
17   Q.  The layout was different in 2010 when the letter was
18       written to expel Mr. Branch?
19   A.  Yeah.  That was 2011.  The --
20   Q.  Or --
21   A.  '11, yeah.  It would have been a bit different.  We
22       had an original, then we had an interim, and then a
23       final which we're in right now.  I'd have to -- there
24       are campus safety maps for each period of time.  I'd
25       have to look at them.

Page 97

1  If you're asking me if this is the way the
2  layout is now, I'd say this is close to it in terms of
3  the parking lots.
4  MS. HUSBAND: Just for the record, it has a
5  date on it that says April 2012.
6  THE WITNESS: Oh, okay.
7  MS. HUSBAND: In the left-hand corner of
8  the --
9  A.  This is close.  This is not exact.
10 BY MR. GODWIN:
11 Q.  Well, has the daycare center moved?
12 A.  No, not at all.  It's always been there.
13 Q.  Where is the daycare center on this map?
14 A.  Look down.  It says CAC at the bottom of the page.
15 Q.  Okay.  So this is -- it's bordering --
16 MR. BRANCH: U of M.
17 A.  It's bordering -- it says the PE building and the
18 science building right now.
19 BY MR. GODWIN:
20 Q.  So the very south of the campus.
21 A.  Okay, yeah.
22 Q.  Is that where it was in 2000- --
23 A.  It's always been there.  It has not moved.
24 Q.  Would you agree that the child care center is not in
25 the center of the campus?

Page 98

1  A.  I would agree that it's at the end of campus.  I would
2  agree it's not in the center of campus.
3  MR. GODWIN: Okay.  We don't have any more
4  questions for you.  Thank you so much for your time.
5  MS. HUSBAND: I'd like to consult with my
6  co-counsel.
7  (Recess taken at 1:53 p.m.)
8  (Back on the record at 2:06 p.m.)
9  MS. HUSBAND: I don't have any questions
10 for the witness.
11 (Deposition concluded at 2:07 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 99

1  CERTIFICATE
2  STATE OF MICHIGAN
3  COUNTY OF OAKLAND
4
5  I, Paula Raskin, CSR and Notary Public in
6  and for the County of Oakland, State of Michigan, do hereby
7  certify that the witness whose attached deposition was taken
8  before me on the date hereinbefore stated, was first duly
9  sworn by the Notary Public to testify to the truth, the
10 whole truth and nothing but the truth in the cause
11 aforesaid; that the testimony contained in said deposition
12 then given by said witness was by me reduced to writing in
13 the presence of said witness by means of shorthand and
14 afterwards transcribed upon a computer by myself.  The said
15 deposition is a true and correct transcript of the testimony
16 given by said witness as aforesaid.
17 I do further certify that the deposition
18 herein attached was taken at the time and place mentioned
19 and described in the caption of said deposition.
20 I do further certify that no request was
21 made by any party for the witness's signature to be attached
22 to said deposition.
23 I do further certify that the parties were
24 represented by counsel as hereinbefore designated.
25 I do further certify that I am not connected by blood or

Page 100

1  marriage with any of the parties or their attorneys or
2  agents and that I am not an employee of either of them, nor
3  interested directly or indirectly in the matters of
4  controversy either as counsel, agent or otherwise.
5  I do further certify that my certificate
6  annexed implies to the original and typewritten copies only,
7  signed and certified transcripts only.  The undersigned
8  assumes no responsibility for the accuracy of any reproduced
9  copies not made under my control or direction.
10
11 _____
   PAULA S. RASKIN, CSR-4757
12 Notary Public,
   Oakland County, Michigan
13 My Commission expires: 12-28-2014
14
15
16
17
18
19
20
21
22
23
24
25